In the Matter of the Estate of WILLIAM C. BURLING, Deceased.

Surrogate's Court, Kings County, September 9, 1933.

*Maurice J. Moore* and *John Francis Moore,* for the National City Bank of New York and another, executors and trustees, etc., of William Raymond Burling, deceased.

*Brennan, Flaman & Simpson* [*George R. Brennan* of counsel], for the respondents Lillie Burling Peatman and Alice Burling Singleton.

*Lynn, Wandless & Lanier* [*Edgar G. Wandless* and *Thomas S. Doughty* of counsel], for Lillie P. Burling.

*Edward G. O'Neill,* special guardian.

*Berwick B. Lanier,* for the respondent R. Bruce Pereira.

WINGATE, S. A frequently reiterated principle of testamentary construction emphasizes the futility of arguments based upon precedents respecting other wills. This court has been at particular pains to call attention to this principle in the hope that thereby a useless waste of the time of litigants as well as its own might be avoided. (*Matter of Rossiter,* 134 Misc. 837, 839; affd., 229 App. Div. 730; affd., 254 N. Y. 583; *Matter of Weissmann,* 137 Misc. 113, 114; affd., 232 App. Div. 698; *Matter of McCafferty,* 142 Misc. 371, 373; affd., 236 App. Div. 678; *Matter of Quinby,* 134 Misc. 296, 301; *Matter of Storey,* Id. 791, 796; *Matter of Grefe,* 140 id. 134, 137; *Matter of Mehler,* 143 id. 63, 66; *Matter of Leonard,* Id. 172, 174; *Matter of Soy,* Id. 217, 219; *Matter of Mann,* 145 id. 360, 361; *Matter of Mead,* Id. 893, 898.) Unfortunately the ultra-voluminous briefs, totaling 206 pages, in the present proceeding demonstrate that these efforts have not been crowned with soul-satisfying success. That this principle is still recognized in the courts of last resort is demonstrated by Judge CRANE's language in *Matter of Watson* (262 N. Y. 284, at p. 297): " Neither do the authorities construing other wills afford us any aid except for the

general principles underlying the interpretation of all documents. The language of each will leads to its own conclusion. No two persons are alike; neither are their wills. Every one has his own peculiar family history, temperament, duties and responsibilities. No two estates are alike. How, then, can we expect one will be a pattern for another? This is one field where standardization has proved ineffectual. We still take each document on its own merits. Either for good or ill, a testament has no progeny. Each is a new creation."

The statement is trite but fundamental that the sole office of the court in testamentary interpretation is to attempt to ascertain the intention of the testator from the words he has used when read in the light of his surrounding circumstances; and to effectuate his wishes in so far as may be permitted by existing rules of law. (*Matter of Bell*, 141 Misc. 720, 721; *Matter of Blake*, 146 id. 780, 784; *Matter of Walsh*, 147 id. 281, 283; *Matter of Holmes*, Id. 394, 398.)

In the present case no testimony or agreed statement of facts has been submitted, wherefore determination must be made upon the basis of uncontroverted allegations and of the will itself.

The will of William C. Burling, who will be designated as the " father," was admitted to probate in this court on October 25, 1923. He was survived by his wife, Lillie R. Burling, by a son, William R. Burling, hereinafter referred to as the " son," and by two daughters. These constituted his sole natural distributees.

In the " third " item of his will, after reciting his harmonious married life and the fact that his wife and he had virtually pooled their resources, he said: " My wife and I have agreed to make similar Wills so as to provide for the survivor of us and our children after the death of both of us."

This sentence strikes the keynote of the entire testamentary disposition and demonstrates testator's dominant desire. In the opinion of the court, it is the failure of certain of the parties to recognize this fact which has contributed to their present confusion of mind. Testator and his wife intended that provision for their survivor should be the paramount end to be attained, and it was only " after the death of both of us " that any substantial portion of the estate should go to their children.

Such substantial provision is contained in the " fifth " item, in which the residue is bequeathed. This is given in trust with a direction that the income be used to

" 1st. Pay the same to my wife * * * during her lifetime, and upon her death

" 2nd. To pay the net income of the same in equal shares to my son * * * and my daughters * * * equally until the 1st day of January, 1940, at which time one-third of the principal shall be paid to ' the son ' as his sole property. The income from the remaining principal shall then be paid by my trustees to my said two daughters until the 1st day of January, 1955, and then the said principal shall be divided between my said daughters equally and to become their sole property.

" In the event of the death of any of my three children before the date above fixed for the delivery of the share of the principal of such deceased child, then this trust as to such share only shall cease on such death and my trustees shall pay such share as directed by the will of such deceased child, or if such deceased child has not left a will then to such child's issue, if any, and if none, then to my next of kin *per stirpes* and not *per capita.*"

In the " sixth " item testator authorized an invasion of principal for the benefit of his wife to the extent of $7,500 a year in certain contingencies.

The document then continued:

" *Seventh.* In the event of the death of my wife after the first day of January, 1940, I direct my trusteees to pay the share of ' the son ' as aforesaid and carry out the provisions of the aforesaid trust for the benefit of my daughters. In the event of the death of my wife after the first day of January, 1955, then I direct distribution of the shares of principal as aforesaid, that is to my three children equally if living, according to the Wills of any of them who have died leaving Wills, and if any have died without Wills, then to such child's issue, if any, and if none, then to my next of kin, *per stirpes* and not *per capita.*

" *Eighth.* In the event that any of my children shall die before me or before my wife leaving issue, then upon the death of my wife, my trustees shall pay such deceased child's share of the principal of my estate as directed by the last will and testament of such deceased child or children of mine, or in default of such Will, then to such child or children's issue, if any, and if none, then to my next of kin *per stirpes* and not *per capita,* and in the event of the death of my wife before me, a like distribution shall be made of such deceased child's or children's share of the principal of my estate."

When these directions are read as a whole (*Matter of Farkouh,* 134 Misc. 285, 286; *Matter of Kirkman,* Id. 527, 528; *Matter of Gargiulo,* Id. 182, 185; 138 id. 90, 98; *Matter of Leonard,* 143 id. 172, 184; *Matter of Grauer,* 146 id. 469, 471; *Matter of Gavey,* 147 id.

332, 335; *Matter of Cronin*, Id. 611, 612), the decedent's intention is entirely obvious as follows:

*First*, and paramount to all other desires, his wife is to have the life use of the entire trust fund up to the time of her death.

*Second*, if the wife dies before January 1, 1940, and the three children survive her, three equal secondary trusts are to be erected from the principal on her death, the income from one of which is to be paid to the son until that date, and the principal paid over to him absolutely on that date, if he be then alive; the income from the two remaining trusts to be paid to the daughters, respectively, until January 1, 1955, when each daughter will receive her principal.

*Third*, if the wife dies between January 1, 1940, and January 1, 1955, and the three children survive her, the corpus is to be divided into three equal parts on her death, one of which is to be paid over absolutely to the son, and the remaining two held for the daughters as provided in " second," *supra*.

*Fourth*, if the wife dies subsequent to January 1, 1955, and the three children survive her, then on her death the corpus is to be divided into three equal parts, and one paid to each child.

*Fifth*, if any child predeceases the widow, or dies before the " date fixed for the delivery of the share of the principal of such deceased child," the share to which it would have been entitled under the contingencies hereinbefore noted is payable on the death of the widow:

A. To the beneficiaries named in his or her will, if a will was left by such child;

B. If no will was left by such child, then to his or her issue;

C. If no will or issue was left by such child, then to testator's next of kin.

The intention as above analyzed is so perfectly clear that no unbiased person could entertain diverse conceptions regarding it. The arrangement is eminently equitable, dedicating the use of the entire estate to the widow for life and providing that on her death one equal share shall go to each of the three children, outright, if the particular distributee had attained the age which testator deemed advisable for its proper preservation, and in trust, if he or she had not, and, finally, giving each child a power of appointment over any part of the corpus not received in possession prior to his or her death, with a primary alternate gift to his or her issue.

Not only is this plan entirely equitable, but it is wholly legal. Whereas in one aspect it contemplated the possibility of trusts for a given period of years, each of them must absolutely terminate

within two lives in being at the death of the testator and consequently the directions no more infringe the terms of the statute than if payment had been directed when the respective beneficiaries attained specified ages. (*Matter of Davison*, 134 Misc. 769, 771; affd., 230 App. Div. 867, 868.)

Considerable controversy has developed among the parties to the litigation as to the nature of the estates of the several children during the continued life of the widow. This seems wholly needless, as the solution is entirely clear. Each unquestionably received that well-recognized species of estate, familiarly designated as "vested subject to being divested" or "contingently vested." (*Matter of Terwilligar*, 135 Misc. 170, 183, 184; affd. on the opinion of this court, 230 App. Div. 763; leave to appeal denied, Id. 846.) The gift to each child was not absolute, but subject to conditions subsequent that the particular donee should survive the primary life tenant and that the time specified for absolute payment over of a share of the corpus should have arrived. (*Matter of Leonard*, 143 Misc. 172, 175, 176; see, also, *Matter of Woodruff*, 135 id. 203, 207, 208; *Matter of Davison*, 137 id. 852, 859; *Matter of Myers*, Id. 868, 871; *Matter of Rowland*, 139 id. 335, 337; *Matter of Wickham*, Id. 729, 731.) Upon the death of any child prior to the fulfillment of these conditions, testator made alternative dispositions of the share of the corpus to which the particular child would have been entitled had he or she survived the widow and the applicable effective date. As noted, these were, *first*, a gift to the testamentary nominees of the particular child, or *second*, failing a will, to his issue, or *third*, failing both, to testator's next of kin. These alternate gifts, which appear several times in the will, definitely negative any intent on the part of the testator to give absolutely vested estates to his children during the life of the widow.

One further matter requires attention before passing to the next phase of the controversy. This concerns the number of measuring lives contemplated by the trusts erected by the will. It is of course primary in such an inquiry that the determination must be made not in the light of what has happened, but must be based on what might have happened as a result of the testamentary directions when viewed with the circumstances surrounding the testator at his death. (*Matter of Terwilligar*, 135 Misc. 170, 175, and cases cited; affd., 230 App. Div. 763; *Matter of Duffey*, 144 Misc. 140, 144, 145; affd., 238 App. Div. 863; *Matter of Howells*, 145 Misc. 557, 562, 563.) The testator died on September 22, 1923, at which time his wife and all three children were living. An estate for the life of the widow immediately came into being. If the children survived the widow and the latter died prior to

January 1, 1940, secondary life estate for each child would, by the directions of the will, come into being in one-third shares of the corpus. Obviously, therefore, the application of the test of possibility demonstrates that the directions of the testamentary document exhausted the allowable period of suspension of alienation. (Real Prop. Law, § 42; Pers. Prop. Law, § 11.)

William R. Burling, testator's son, died on February 11, 1929, married but without issue. He predeceased his mother, the primary life tenant, by approximately thirty-eight months, as she died on April 9, 1932.

Obviously, under the terms of the will, the income of the entire estate of the father was payable to the widow until the time of her death. The question for present determination is as to the disposition following her death, of the one-third of the corpus not dedicated to the daughters.

As has been noted, the son's personal right to one-third of the corpus was subject to the fulfillment of two conditions subsequent, namely, that he should survive his mother and that the date of January 1, 1940, should have arrived. Neither met with compliance, wherefore the disposition of this portion of the estate must be sought in the alternative directions of the father's will, which were, as noted, that the son should have a power of appointment over it by his will, failing the exercise of which it should pass to his issue, if any — and he left none — and failing both, to the father's next of kin.

At the time of his death the son was domiciled in the State of New Jersey, and left a will which was there probated on March 16, 1929, and was also proved and allowed in this court on March 7, 1929. This document, while not expressly purporting to exercise the power of appointment granted by his father's will, was obviously intended to affect all property over which he held the right of disposal, wherefore, under section 18 of the Personal Property Law, his testamentary disposition must be held to embrace the portion of the father's estate over which he possessed a power of appointment. (*Matter of Mann*, 138 Misc. 42, 45; *Matter of Wickham*, 139 id. 729, 731; *Matter of Marsland*, 142 id. 230, 233.)

Before analyzing the tangible results of the son's act of appointment, the familiar principle should be noted that the act of exercise of a testamentary power of appointment is, in reality, merely the performance of an agency intrusted by the original testator to the donee of the power, whereby the latter is, in effect, authorized to make a disposition of a portion of the property contained in the original estate. (*Matter of Terwilligar*, 135 Misc. 170, 176; affd., 230 App. Div. 763; see, also, S. C. 142 Misc. 249, 251, 252.) It is

in essence an authority given by the first testator to the donee of the power to execute a valid codicil to the will of the former in respect to some particular portion of his estate. It is for this reason that the document purporting to exercise a power of appointment is invariably read into that granting the power and the two instruments construed as a single entity. (*Matter of Terwilligar*, 135 Misc. 170, 174; affd., 230 App. Div. 763; *Matter of Davison*, 137 Misc. 852, 858; affd., 236 App. Div. 684; *Matter of Mann*, 138 Misc. 42, 46; *Matter of Wickham*, 139 id. 729, 731; *Matter of Harbeck*, 142 id. 57, 59; *Matter of Marsland*, Id. 230, 232; *Matter of Kraetzer*, 147 id. 609, 610.) For like reason, a foreign will exercising a power of appointment granted by a domestic one is, in respect to the effect of such appointment, governed by domestic law. (*Matter of Marsland*, 142 Misc. 230, 232, and cases cited.)

With these preliminary observations, the will of the son will be considered. Except for a bequest of his business, his entire estate is given to trustees to pay the income to his wife for life or until remarriage and upon the termination of such trust fifty per cent of the remainder is given to George School and the other fifty per cent is given, $53,000 to ten named individuals in specified amounts, and the balance to the children of his sisters, or, if none, to his sisters. The sister Lillie Burling Peatman has one child, Alice Burling Peatman. The other sister, Alice Burling Singleton, while married, is childless. It is alleged and not controverted that the proper corporate title of George School is Trustees of Philadelphia Yearly Meeting of Friends, which conducts this school.

The total principal accounted for by the trustees, subject to costs and charges, amounts to $319,397.61. One-third of this, being the portion over which the son's power of appointment extends, equals $106,465.87.

Eliminating contingencies which have not occurred, and considering only that portion of the father's estate presently in controversy, the composite result of the original will and of that exercising the power of appointment is as follows:

*First.* A trust for the widow for life.

*Second.* A possible trust for the son for a period of years less than life (which amounts to a second life in statutory contemplation). (*Matter of Howells*, 145 Misc. 557, 563.)

*Third.* A trust for the life of the son's wife or until her remarriage.

*Fourth.* Absolute gifts of the remainder to named individuals.

It is obvious that this composite direction violates the Statute of Perpetuities, since the absolute power of alienation is suspended for three lives in being at the death of the testator, while the statutes permit such suspension for two only. (Real Prop. Law, § 42;

Pers. Prop. Law, § 11; *Matter of Terwilligar*, 135 Misc. 170, 175; affd., 230 App. Div. 763; *Matter of Davison*, 134 Misc. 769, 771; affd., 230 App. Div. 867.)

It follows that the trust for the third life, namely, that of the son's widow, is void and must fail. It is, however, the policy of the courts to save so much of a testamentary direction as may be possible without a destruction of the testamentary plan. (*Matter of Terwilligar*, 135 Misc. 170, 181, 182; affd., 230 App. Div. 763; *Matter of Enright*, 139 Misc. 192, 199; *Matter of Meyer*, 140 id. 1, 5; *Matter of Knoll*, 146 id. 613, 614; *Matter of Stulman*, Id. 861, 867; *Matter of Cronin*, 147 id. 611, 612.) Whether or not the gifts of the remainder following the life estate to the wife of the son can be saved by acceleration depends on whether these gifts are absolutely vested in the respective beneficiaries and whether the present is one of those exceptional cases in which acceleration would unbalance the entire testamentary plan. No good purpose would be served in reviewing the law in this regard, since it has been fully considered and all pertinent decisions up to the end of the year 1929 analyzed in *Matter of Terwilligar* (135 Misc. 170; see particularly pp. 177–185; affd. on the opinion of this court, 230 App. Div. 763). It is obvious that in the composite directions at bar the illegal gift to the wife stands alone and is not interwoven in any way with the gifts of the remainder. It is equally obvious that the manner of giving of the remainder gifts complies with the deduced rule permitting acceleration, stated at page 184 of the *Terwilligar* case. This rule reads: " if viewing the matter as of the date of death of the testator, one or more persons can be specifically pointed out who, if all of the directions of the testator, both valid and invalid, were given effect, would, upon the termination of the previous estates, be absolutely entitled to the remainder without qualification or condition of survivorship or otherwise, then on the deletion of the invalid provisions such individuals will take, otherwise they will not." This condition applies to the specified residuary legatees George School (or to give the beneficiary its proper title, the Trustees of Philadelphia Yearly Meeting of Friends, a Pennsylvania corporation), Malcolm Gray, Jr., Donald Gray, Robert Forker, William L. Forker, Ida Van Doren, Bruce Pereira, Madge Pereira, Carrie Raymond, Lillian Raymond and Maurice Moore. It does not apply to those specified in the remainder gift in item " fifth 2 " of the son's will, since it cannot presently be determined whether the child of Lillie Burling Peatman would be living at the death of the son's wife or whether her mother or aunt would be living. The interests under the will of these three individuals are only contingently vested, and

under such circumstances the law is perfectly clear that their benefits may not be accelerated.

As a matter of computation, however, the determination that the son's niece and sisters are not entitled to any present distribution, is a matter of negligible moment. Even were the principal presently distributable, amounting to $106,465.87, not to be reduced by any costs or allowances, the fifty per cent payable to George School would reduce the capital sum to $53,232.93 and the benefits payable prior to any distribution to the niece or sisters total $53,000.

Proceed accordingly.